**UNITED STATES, Appellee,**

v.

**Specialist Marvin D. GUEST, United States Army, Appellant.**

**ARMY 9501335.**

U.S. Army Court of Criminal Appeals.

23 May 1997.

For Appellant: William E. Cassara (argued); Captain John M. Head, JA (on brief); Major Leslie A. Nepper, JA.

For Appellee: Captain Mary E. Braisted, JA (argued); Colonel John M. Smith, JA; Lieutenant Colonel Eva M. Novak, JA; Captain Joanne P. Tetreault, JA (on brief).

Before COOKE, GORDON, and ECKER, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

COOKE, Chief Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted murder, desertion terminated by apprehension, reckless driving, wrongful use of cocaine, endangering human life by discharging a firearm, carrying a concealed weapon (two specifications), and communicating a threat in violation of Articles 80, 85, 111, 112a, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 885, 911, 912a, and 934 (1988) [hereinafter UCMJ]. The court-martial sentenced appellant to a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the adjudged sentence and credited the appellant with 126 days for time spent in pretrial confinement.

On this review pursuant to Article 66, UCMJ, appellant has raised nine assignments of error.[1] While we find that none merit relief, several warrant discussion.[2]

### I. Jurisdiction and Desertion

Appellant contends that the court-martial lacked jurisdiction over him because of his discharge from the Army, and that because of his transition leave and discharge, the evidence is insufficient to support his conviction of desertion. The following facts are relevant to these claims.

In November 1994, appellant began out-processing from his unit and the Army, in anticipation of his transition leave and scheduled expiration term of service (ETS) on 20 January 1995. On 8 November 1994, appellant reported to the transition point, having completed a substantial portion of the out-processing required by his company, U.S. Army Medical Activity (MEDDAC), Fort Jackson, South Carolina, and the Army. On 8 or 9 November 1994, appellant received a courtesy copy of his DD Form 214, Discharge Certificate, with an effective date of 20 January 1995. Appellant was specifically told by the personnel clerk, consistent with Army policy, that this copy was not an official certificate, but was provided to him in order to clarify his status with potential employers, and for similar purposes, during transition leave and until his official certificate was forwarded to him. Similarly, appellant processed through the finance office and was told how much money he could expect to receive upon his discharge; however, this did not consist of a final accounting of pay, as required by 10 U.S.C. § 1168. Also, appellant elected to retain his active duty identification card (DD Form 2), although he was told that he would not receive his official discharge certificate or his final pay until he surrendered the card.

Appellant was on permissive temporary duty, approved by the MEDDAC, from 2 until 21 November 1994, and had approved transition leave scheduled to begin on 22 November 1994. Appellant signed in at the transition point on 8 November 1994. Appellant did not, however, immediately vacate the MEDDAC barracks, and retained his room key and meal card until 21 November.

On 14 November 1994, the MEDDAC company commander, acting on probable cause,

---

1. In his submission pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), appellant reiterates two of these assigned errors.

2. Although not assigned as an error, we note that appellant's arraignment was conducted by telephone, with the military judge in one location and the parties at another. We have previously found this procedure to be error. *See United States v. Reynolds,* 44 M.J. 726 (Army Ct.Crim. App.1996). Our review of the entire record reflects that appellant was in no way prejudiced by this procedure, however, so we find the error to be harmless. UCMJ art. 59(a).

directed appellant to submit to a urinalysis search. On 16 November, a field test of appellant's sample indicated a positive result for cocaine and the MEDDAC company commander flagged appellant (i.e., annotated appellant's records to reflect suspension of favorable personnel actions, pursuant to Army Reg. 600–8–2, Personnel–General: Suspension of Favorable Personnel Actions (Flags)(30 Oct. 1987) [hereinafter AR 600–8–2] ). On 22 November, the MEDDAC company commander informed appellant that his transition leave was canceled and that he was flagged; appellant was directed to report to the first sergeant for further instructions. Appellant instead absented himself, and remained so absent until he was apprehended by civilian authorities on 15 February 1995. The MEDDAC characterized appellant's status as absent without leave on 28 November 1994, and he was dropped from the rolls on 28 December 1994. The unit's efforts to locate appellant were unsuccessful, apparently because appellant provided an incorrect leave address.

On 5 December 1994, Headquarters, Fort Jackson, revoked the orders which transferred appellant to the transition point and which would have operated to separate appellant from the Army on 20 January 1995. No final accounting of appellant's pay was conducted, and, except for the courtesy copy, no DD Form 214 was ever issued.

On 10 March 1995, the general court-martial convening authority approved appellant's retention on active duty past his expiration term of service. *See* Army Reg. 635–200, Personnel Separations: Enlisted Personnel, para. 1–24 (17 Sep. 1990). Appellant was placed in pretrial confinement and charges were preferred on 15 March 1995. The court-martial commenced on 3 May 1995.

### A. Jurisdiction

Appellant contends that, pursuant to the courtesy DD Form 214, he was discharged from the Army on 20 January 1995. We disagree.

Appellant was never, in fact, discharged from the Army. The DD Form 214 which appellant received on about 8 November 1994 was a courtesy copy. It was not intended to, and did not, serve as an official discharge, and appellant was so informed.[3] On 5 December 1994, competent authority revoked appellant's separation orders, and no other DD Form 214 was ever issued. Consequently, appellant remained subject to court-martial jurisdiction past his original separation date of 20 January 1995. *United States v. Poole*, 30 M.J. 149 (C.M.A.1990).

■ Under *Poole*, even if the MEDDAC commander did lack authority to flag appellant and to cancel his transition leave, the fact that appellant never received a valid discharge means that he remained subject to court-martial jurisdiction, even for offenses committed after his original ETS. *Poole*, 30 M.J. 149. Accordingly, we find that the court-martial had jurisdiction to try appellant on all the charges referred to it.

### B. Desertion

■ Appellant also contends that, because his absence spanned the period of his scheduled transition leave and discharge, his absence was authorized and, therefore, the evidence is legally and factually insufficient to support the findings of guilty of desertion and the included offense of absence without leave. More specifically, appellant contends that, because he had already signed in to the transition point, the MEDDAC company

---

3. Appellant concedes that the certificate would have had no effect until the effective date of 20 January 1995. We find that, because it was never intended to operate as the official certificate—and both the Army and appellant so understood—it could never take effect. The intent of the parties is germane to the effect which such a certificate may have. *See United States v. King*, 27 M.J. 327 (C.M.A.1989); *United States v. Johnson*, 6 U.S.C.M.A. 320, 20 C.M.R. 36, 1955 WL 3535 (1955). Even if the certificate had been intended to effect discharge on 20 January 1995, the revocation of appellant's separation orders on 5 December 1994 negated such effect. *Cf. United States v. Garvin*, 26 M.J. 194, 195 (C.M.A. 1988) ("[T]he orders directing appellant's discharge were rescinded by the commander who issued them in the first instance. Accordingly, it was not an authorized discharge within the meaning of Article 2.") To conclude otherwise would mean that the Army was powerless to stop appellant from separating on 20 January 1995 once it issued the certificate, unless it could physically recover the certificate from the soldier. The harmful effect of such a construction on good order and discipline is plain.

commander lacked the authority to flag appellant and to cancel appellant's transition leave. Therefore, when appellant departed, he was on authorized transition leave. Appellant also argues that the same circumstances support a mistake of fact defense for desertion and the underlying absence without leave.

 In testing for legal sufficiency, we must determine whether a reasonable fact finder could find all the essential elements beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The test for factual sufficiency is whether, after weighing all the evidence in the record and making allowance for not having personally observed the witnesses, we are convinced of appellant's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

 If the appellant actually, albeit erroneously, believed that he had authorized transition leave and (after 20 January 1995) that he was discharged from the Army, he would not be guilty of desertion. If this belief were objectively reasonable, this would also constitute a defense to absence without authority. *United States v. King*, 27 M.J. 327 (C.M.A.1989); *United States v. Vance*, 17 U.S.C.M.A. 444, 38 C.M.R. 242, 1968 WL 5378 (1968); *United States v. Holder*, 7 U.S.C.M.A. 213, 22 C.M.R. 3, 1956 WL 4723 (1956).

We find that the MEDDAC commander retained command authority over appellant after 8 November 1994, such that he had the authority to flag appellant on 16 November.

The orders assigning appellant to the transition point had a reporting date of 18 November 1994. The military judge found, and we agree, that until that reporting date, appellant remained subject to the authority of the MEDDAC commander. Normal procedure calls for the soldier to report to the transition point on the date of transition. Army Reg. 635–10, Personnel Separations: Processing Personnel for Separation, para. 3–1.1 (1 July 1984); Dep't of Army Pam. 600–8–11, Military Personnel Office Separation Processing Procedures, Table 2–1–2, Rule 4 (1 Mar. 1982). Moreover, appellant did not physically vacate the MEDDAC until 21 November 1994.[4] Based on all these circumstances, we find that appellant remained subject to the authority of the MEDDAC commander.[5]

Therefore, the MEDDAC commander had authority to initiate the flag and to cancel appellant's transition leave.[6] Accordingly, appellant's absence from 28 November 1994 to 15 February 1995 was unauthorized.

 We are satisfied that appellant intended to remain away from his unit and the Army permanently. Appellant does not contend that he intended to return; instead he argues that he was absent under the mistaken belief that he was authorized to be away. We are convinced that appellant held no such belief. Appellant was told, shortly before he departed, that he was suspected of drug abuse, that he was flagged and his transition leave canceled, and that he must report to the first sergeant. Appellant voiced no challenge to the validity of these orders; instead, knowing he faced possible disciplinary action and that his discharge was in jeopardy, he departed and initiated no further contact

---

4. We note that Army Reg. 27–10, Legal Services: Military Justice, para. 3–8a(3)(24 June 1996), describes the following test for determining whether "an individual is 'of the command' of a particular commanding officer" at least for purposes of Article 15, UCMJ, authority, when orders are unclear or silent: *"(a)* The phraseology used in the orders. *(b)* Where the soldier slept, ate, was paid, performed duty, the duration of the status, and other similar factors."

5. This determination also resolves appellant's challenge to the authority of the MEDDAC commander to direct appellant to submit to a urinalysis based on probable cause.

6. In his brief, appellant contends that, "at the latest, on 18 November 1994, the date listed on his orders" appellant ceased to be a member of the MEDDAC, such that the MEDDAC commander lost authority to cancel appellant's transition leave. However, as we have held that the MEDDAC commander had authority to flag appellant on 16 November, this argument fails. The action of flagging appellant precluded appellant's transfer to the transition point. AR 600–8–2, para. 1–14c. Therefore, even after 18 November, appellant remained in the MEDDAC and subject to the MEDDAC commander's authority.

with the Army. Indeed, he avoided such contact; for almost a month after his original separation date, appellant did not inquire as to his official discharge certificate or, significantly, about the approximately $12,000 which finance had estimated he would be due when his pay was finally accounted for. This demonstrates that appellant harbored no illusion that he had approved leave or had been discharged from the Army. Instead, rather than remain to face possible drug charges, appellant absented himself, knowing he had no authority to do so, and with no intent to return.

Therefore, we find that appellant's conviction of desertion terminated by apprehension is factually and legally sufficient.

## II. Attempted Murder

■ Appellant also contends that the evidence was insufficient to support the finding of guilty of attempted murder. Specifically, he argues that the evidence does not establish that he had the specific intent to kill when he fired a weapon in the direction of B. See United States v. Roa, 12 M.J. 210 (C.M.A.1982).

The evidence reflects that during the early morning hours of 15 February 1995, four college students were returning to their car after spending the evening in a bar. Each had consumed several beers. On their way to their car, they saw an empty vehicle with the motor running, and one of them joked that it would be funny if they drove the vehicle away. Then a voice said, "It would be funny if you lived," or words to that effect. The speaker was appellant. Appellant got into the vehicle, which was his, and followed the four students to the parking lot where their car was parked.

Once in the parking lot, appellant began yelling at the students, and they yelled back. Appellant exited his vehicle and approached the students. One of the students, B, and appellant exchanged profanities, and appellant produced a pistol from his waistband and held it to B's head. B raised his hands and suggested that they all just leave. Appellant cocked the weapon and pressed the muzzle against B's forehead, forcing B to walk backward. Appellant continued to jab the gun at B's forehead, finally using such force that B stumbled and turned so that his back was to appellant. Twice more, appellant jabbed B with the weapon, now in the back of the head. The second time appellant jabbed B with considerable force and, simultaneously, fired the gun. B felt a rush of air by his right ear and fell to the ground. Two of the other students said the gun was pointed at B when it was fired. (The third student was looking away at the moment the shot was fired.) Thinking B had been shot, B's companions rushed to him, while appellant got in his vehicle, circled the parking lot once, and then sped away. B suffered a perforated eardrum, but no other physical injury.

We apply the same standards of legal and factual sufficiency here. Jackson, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; Turner, 25 M.J. 324.

We are satisfied that appellant intended to kill B. Appellant made a threatening comment shortly before his confrontation with B. Appellant initiated and continued the confrontation with the students. Appellant produced a loaded weapon, cocked it, and pointed it at B's head. Even as B moved backward and stumbled, appellant consistently kept the gun pointed at B's head. Appellant fired the weapon almost immediately after the muzzle struck B in the back of the head. There is no evidence that appellant directed the gun away from B when he fired—indeed the evidence is to the contrary. There is no evidence that the firing was unintentional—appellant showed no surprise or concern when B fell to the ground, apparently shot. "It may be inferred that a person intends the natural and probable consequences of an act purposely done." Manual for Courts-Martial, United States, (1995 edition), Part IV, para. 43c(3)(a). The natural and probable consequence of firing a gun at someone's head is death.

Appellant suggests that, because it would be hard to miss a target at such close range, the fact that the shot did miss reflects an absence of intent to kill. We are convinced that good fortune, not lack of intent, is what saved B's life on 15 February 1995. Accordingly, we find the evidence is legally and

factually sufficient to support the finding of guilty of attempted murder.

### III. Petition for New Trial

In addition to his assignments of error, appellant has submitted a petition for a new trial with respect to his conviction for use of cocaine, based on newly discovered evidence; this petition has been referred to us by The Judge Advocate General. UCMJ art. 73; Rule for Courts–Martial 1210 [hereinafter R.C.M.]. We find that the newly discovered evidence would not probably produce a substantially more favorable result for appellant. *See* R.C.M. 1210(f)(2)(C). Accordingly, the petition is denied.

The findings of guilty and the sentence are affirmed.

Senior Judge GORDON and Judge ECKER concur.